DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Olusegun Falana, | ) | |
| | ) | CASE NO. 5:08 CV 720 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| Kent State University, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## INTRODUCTION

In this action for correction of inventorship, the Court previously determined that plaintiff was an inventor of United States Patent No. 6,830,789 (the '789 Patent).  That determination was affirmed by the Federal Circuit.  *Falana v. Kent State University*, 669 F.3d 1349 (6th Cir. 2012).

Presently before the Court are plaintiff's motions for attorney fees pursuant to 35 U.S.C. § 285.  For the reasons discussed below, plaintiff's motion for attorney fees, and supplemental motion[1] for attorney fees, are GRANTED in the amounts set forth herein.

## BACKGROUND

A.    Inventorship Determination

In this action for correction of inventorship, plaintiff sought to be added as a coinventor

---

[1]    After filing a motion for attorney fees (ECF 104), the plaintiff supplemented his motion (ECF 122) also seeking fees related to defendants' appeal to the Federal Circuit.  For purposes of clarity regarding the Court's separate analysis and award, the Court will refer to plaintiff's supplement (ECF 122) as a "supplemental motion."

(5:08 CV 720)

of the '789 Patent.  The Court conducted a bench trial, at which the Court was able to observe

and question the witnesses for both sides and assess their credibility, and to examine oroginal

exhibits introduced by the parties.  After the lengthy bench trial, the Court issued its Findings of

Facts and Conclusions of Law (ECF 92) in which the Court concluded that plaintiff is an

inventor of the '789 Patent, and ordered the Director of the United States Patent and Trademark

Office to add the plaintiff as a named inventor and issue a certificate of correction for the '789

Patent. ECF 92, 93 and 94.

Defendants appealed the Court's legal conclusion that Falana was an inventor to the

Federal Circuit, but did not challenge any of the Court's Findings of Fact.  The Federal Circuit

affirmed, noting that:  "This case is simply the application of the well-known principle that

conception of a compound requires knowledge of both the chemical structure of the compound

and an operative method of making it."  *Falana*, 699 F.3d at 1358.

B.    Attorney Fees

In the Court's Findings of Fact and Conclusions of Law concluding that plaintiff is an

inventor of the '789 Patent, the Court also determined, without the benefit of briefing, that this

case was exceptional within the meaning of 35 U.S.C. § 285, and plaintiff submitted an

application for attorney fees.[2]  However, the Court deferred action on plaintiff's fee application

---

[2]    Plaintiff's application for fees and costs is found at ECF 104.  Defendants
responded to Plaintiff's application for attorney fees (ECF 105), to which plaintiff
replied (ECF 106).

(5:08 CV 720)

pending defendants' appeal of the Court's judgment on inventorship.[3]

Post-appeal, the parties were unable to resolve the attorney fee issue through mediation and the Court conducted a status conference.  At the status conference, both sides expressed the desire to fully brief the Court in support of their respective positions regarding plaintiff's motion for attorney fees under § 285.  The Court concluded that the parties should be permitted to fully brief this issue, and indicated to the parties that the Court was prepared to fully reconsider the portion of its Findings of Facts and Conclusions of Law regarding the exceptional case determination.  ECF 120.  The Court established a briefing schedule and the parties submitted their briefs in a timely manner.  See ECF 121, 122, 123, 124, and 125.

Plaintiff subsequently requested discovery on the attorney fee issue.  ECF 126.  Defendants opposed plaintiff's request on the grounds of relevance and privilege (ECF 130), to which plaintiff replied (ECF 131) and defendant filed a sur-reply (ECF 134).

The Court ordered defendants to produce the documents at issue for *in camera* review.  ECF 133.  After conducting an *in camera* review, the Court issued an Order allowing plaintiff limited discovery and granting leave to file supplemental briefs upon completion of discovery.  ECF 135.  After discovery was complete, both parties filed supplemental briefs.  ECF 138 and 139.

---

[3]     The Court's conclusion that this case was "exceptional" was not a final order, however, the defendants nevertheless also appealed that issue to the Federal Circuit along with their inventorship appeal.  In its opinion affirming the Court's conclusion that plaintiff is a co-inventor of the '789 Patent, the Federal Circuit did not consider defendants' "appeal"regarding attorney fees because that issue was not properly before the panel.

(5:08 CV 720)

C.      Summary of Factual Background

The Court previously published its  Findings of Facts and Conclusions of Law in connection with the inventorship determination, and those findings of fact are incorporated herein.  ECF 92.  Although the Court's earlier inventorship determination found at ECF 92 extensively details the factual background of this case, a brief factual summary may be helpful here.

Prior to the Court ordering the addition of plaintiff Falana as a co-inventor on the '789 Patent, the named inventors were Joseph Doane, Asad Khan, and Alexander Seed.  All three inventors were named as defendants by Falana when this case was filed.  Also named as defendants were Kent State University (KSU) and Kent Displays, Inc. (KDI).  KSU and KDI are the owners of the '789 Patent.

The relationships of these defendants are inextricably intertwined.  KDI is a technology spin-off company of KSU.  KDI designs and manufactures liquid crystal displays for electronic devices. Doane, a retired emeritus KSU faculty member, was the chief science officer of KDI during the time period relevant to this case. Doane and KSU are shareholders of KDI.  Khan worked at KDI, reported to Doane, and was a doctoral candidate at KSU.  Seed is a KSU faculty member.

KDI undertook a government funded research project to develop chemical compounds that would improve the performance of liquid crystal displays (the KDI Project).  The KDI Project was funded by multiple government sources and funding exceeded $500,000.

4

(5:08 CV 720)

KDI contracted with KSU for Seed to develop the compounds for the KDI Project.  Seed in turn sought to hire a Ph.D. in chemistry and advertised for a post-doctoral researcher to work independently and develop the chemical compounds required by the KDI Project.

Plaintiff Falana, who received his Ph.D. in chemistry from Brandeis University as a synthetic method development chemist, was selected by Seed in January 1998 to develop compounds for the KDI Project.  Falana's salary at KSU was paid by the funding that KDI had secured from the government for the KDI Project.  The National Science Foundation (NSF) grant application that Doane prepared for the KDI Project identified the Director of KSU's Liquid Crystal Institute as the "Research Institution Investigator."  KSU employees Seed and Falana were identified as "Co-Research Institution Investigators."

During his time at KSU, Falana conducted research to synthesize compounds that would meet the goals of the KDI Project, all the while working closely with Seed, Doane, and Khan on the KDI project.  Falana recorded his research in three research notebooks.  During the course of his research Falana developed a synthesis protocol with resulted in the synthesis of Compound 7, which the KDI Project team recognized as significant progress toward the KDI Project's goal.

Falana left KSU in September 1999 to take another position.  Doane and Seed required Falana to leave his research notebooks for the KDI Project at KSU.  Within several months after Falana's departure, Seed synthesized Compound 9 using Falana's synthesis protocol.  The KDI Project team viewed Compound 9 as fulfilling the KDI Project's goal.

Falana came to learn that a patent had been obtained regarding the work of the KDI Project.  Seed, Doane and Khan were named inventors on the '789 Patent, but Falana was not.

(5:08 CV 720)

Falana attempted to correct the omission of his name as an inventor through the statutory process, which requires the agreement of the named inventors to add the name of another inventor.  However, Seed, Doane and Khan would not agree to the addition of Falana's name as an inventor on the '789 Patent.  As a consequnce, Falana brought this action to be named as a co-inventor on the '789 Patent.

Although they were unwilling to do so prior to the lawsuit, after months of litigation, Doane and Khan ultimately filed statements that they had no objection to the addition of Falana as a named inventor on the '789 Patent.  As a consequence, Doane, Khan and KDI were dismissed from the lawsuit.

Kent State University and Seed remained as defendants. After a lengthy bench trial, the Court issued its Findings of Fact and Conclusions of Law and ruled that Falana was a co-inventor of the '789 Patent and ordered that the patent be corrected to include Falana as an inventor.

KSU and Seed appealed the Court's inventorship decision.  The Court also concluded that this case was exceptional under 35 U.S.C. § 285, but deferred a decision on attorney fees until after the Federal Circuit ruled on the Court's final order on inventorship.

Even though the Court had expressly indicated that no final order would be issued on the issue of attorney fees pursuant to § 285 until the Federal Circuit ruled on defendants' appeal of the Court's inventorship order, defendants nevertheless appealed the exceptional case issue to the Federal Circuit.  However, the Federal Circuit declined to consider that issue because the Court had not issued a final order on attorney fees.

6

(5:08 CV 720)

## FINDINGS OF FACT

The Court conducted a four day bench trial in this case. The Court previously published its Findings of Facts and Conclusions of Law in connection with the Court's inventorship determination, and those findings of fact are incorporated herein. ECF 92.

At the trial, witnesses gave lengthy testimony upon examination by counsel for both sides. The witnesses included the three named inventors of the '789 Patent, Doane, Khan and Seed, and well as the plaintiff, Olusegun Falana. In addition, the Court had the opportunity to question the witnesses, observe the demeanor of the witnesses, evaluate their credibility, and examine the exhibits, including original documents.

In connection with plaintiff's motions for attorney fees now under consideration, the Court makes the following Findings of Fact, in addition to those incorporated herein. These Findings of Fact are supported by and based upon the Court's consideration of all of the evidence, including trial testimony and admitted exhibits, and the Court's observation and evaluation of the witnesses' demeanor, credibility, and qualifications, and the record of this case.

The Court's use of headings in this opinion is for convenience only. If a finding of fact appears under a different heading and is pertinent to the Court's analysis, determinations and conclusions, that finding of fact is adopted by the Court for that purpose even though it may appear under a different heading in this Memorandum Opinion.. Any conclusion by the Court that may be construed as including a finding of fact is hereby adopted as a finding of fact.

1.      The Court previously determined that plaintiff Falana was a co-inventor of the '789

        Patent from a record that is replete with evidence that Falana engaged in a collaborative

7

(5:08 CV 720)

and concerted effort with Seed, Doane, and Khan to conceive the invention that is claimed in the '789 Patent. ECF 92.

2.    Doane and Seed testified at trial regarding Falana's role in the KDI Project and in the conception of the invention of the '789 Patent.  ECF 92.

A.    Doane's Testimony

1.    Doane identified both Seed and Falana on NSF grant application for KDI Project as "Co-Research Institution Investigators" which Doane testified accurately described the roles that Seed and Falana played in the KDI Project.  Doane Testimony, Tr. Pp. 59-61, 99-105; Plaintiff's Ex. 26.  The work of both co-research institution investigators, Seed and Falana, led to the discovery of the novel chiral materials which are the subject of the '789 Patent.

2.    Doane authored a letter to the Immigration and Naturalization Service (INS) dated April 13, 1999 in support of Falana's immigration status, more than a year after Falana began working for KSU with the KDI Project team "on the bases of his approved I-40 for his advanced degree, exceptional research and contribution to the interest of the United States."

3.    When Doane's letter to the INS regarding Falana was prepared on Kent State University letterhead in his capacity ad Director Emeritus of KSU's Liquid Crystal Institute.  P. Ex. 25.

4.    Doane's letter to the INS describes the KDI Project and government funding, and then goes on to describe Falana's role in the KDI Project as follows:

8

(5:08 CV 720)

> "Dr. Falana is actively involved in these projects and the sole organic chemist responsible for the synthesis of the chiral materials. Thus, our research is critical and of immense import to the U.S. national interest. Dr. Falana joined our research team in January 1998. His outstanding performance led to a patent we are currently preparing and a proposal we have submitted to NSF in December 1998. With this grant, we shall renew Dr. Falana's current contract, which ends on July 31."

Doane Testimony, Tr. pp. 87-90; P. Ex. 25.

5.      According to Doane's trial testimony, his letter to the INS about Falana's role in the KDI

        Project contains multiple incorrect statements:

        . . . .
| | |
|---|---|
| Witness: | Oh, yes. "And the sole organic chemist responsible for the synthesis of the chiral materials."  That statement is wrong. |
| The Court: | Read the whole paragraph and then tell me how many incorrect statements you made. |
| Witness: | Okay. "Thus our research is critical of the immense"-- |
| The Court: | And of immense. |
| Witness: | "Thus our research is critical and of immense import to the U.S. national interest.  Dr. Falana joined our research team in January 1998.  His outstanding performance lead [sic] to a patent we are currently preparing and a proposal we have submitted to NSF in December 1998.  This grant, we shall–with this grant we shall [renew][4] Dr. Falana's contract which ends on July 31." |
| The Court: | Now which statements–which sentences are incorrect? |
| Witness: | The sentences that are incorrect is the first sentence–the sentence that says he's the sole organic chemist. |
| The Court: | And did you sign the letter? |
| Witness: | Yes, I did. |
| The Court: | Did you read the letter? |
| Witness: | I must not have.  I never did–I must have not read it carefully. |
| The Court: | Who dictated the letter? |
| Witness: | I think–I'm not sure.  I don't recall exactly how this letter was prepared but many of these letters like this are prepared by the attorney that's representing the client who's applying for immigration and naturalization. |

---

[4]      The transcript of Doane's testimony reflects the word "review."  However, the text of  Doane's letter to the INS, P. Ex. 25, which Doane had before him at trial, reads "renew," not "review."

9

(5:08 CV 720)

| | |
|---|---|
| The Court: | And who gave the information to the attorney? |
| Witness: | I'm not sure. |
| The Court: | Well, somebody had to give him the information. |
| Witness: | Yes, they did. |
| The Court: | Who do you suppose gave him the information that he is the sole organic chemist. |
| Witness: | I don't know. |
| The Court: | Is the next sentence, his outstanding performance led to a patent, is that correct or incorrect? |

. . . .

| | |
|---|---|
| Witness: | I don't know. |
| The Court: | Thank you.  You just sign letters with statements of fact that you don't know whether they're true or not, even though you're the director emeritus of the Liquid Crystal Institute?  You know, I'm–you may understand this, but I'm a pretty reasonably busy guy.  And now I've got an argument between people as to whether or not Dr. Falana made a contribution to the patent. |
| | Now I'm going to spend three or four days apparently on this issue because you can't agree, but I really, really want to know about this paragraph.  And I want you to tell me whether it's true, not true, or I should just disregard it. |

. . . .

| | |
|---|---|
| Witness: | He contributed to the patent in the sense that the whole subject of this research was to develop intellectual property that would help us–prevent us from being blocked by a foreign patent that was blocking us at the time. We wanted to develop our own intellectual property.  It was in our minds all along that if we were successful in this research that we would write a patent. |

. . . .

| | |
|---|---|
| The Court: | Then let's go down to the next sentence. Where it says his outstanding performance let to a patent we are currently preparing.  Is that correct or incorrect? |
| Witness: | Well, its only correct in the sense that in our minds we are preparing it.  It was not written down.  There was no writing on a patent until the time we wrote the disclosure. |

. . . .

| | |
|---|---|
| The Court: | You were just kind of puffing what he was doing for the immigation? |
| Witness: | That's right. |

Tr. Pp. 87-90; 145-146.

10

(5:08 CV 720)

6.    According to Doane, the incorrect statements to the INS regarding Falana was motivated by Doane's desire to do Falana a "favor," and not to mislead the INS.  Tr. pp. 145-47.

7.    Doane's testimony and the documentary evidence reflect inconsistent statements to the INS and to the Court at trial regarding Falana's role in the KDI Project and the status of the '789 Patent.  At trial, Doane's testimony attempted to downplay Falana's role in the KDI Project and in the conception of the invention claimed in the '789 Patent.  However, to the INS, Doane states that Falana's work led to the '789 Patent.  According to Doane, he inflated Falana's abilities and role in the patent to the INS to do Falana a favor. Separate from the issue of whether Doane's statements to the INS relate to Falana's status as an inventor, Doane has made false statement of fact–either to the INS or to this Court.

8.    Doane's testimony regarding the INS letter was not the only time during Doane's testimony that the Court questioned Doane's credibility.  "The Court: I don't know how I'm supposed to assess his credibility.  But I'm telling you, his credibility, I'm telling you it's shaky."  Tr. p. 150.

9.    After considering Doane's entire testimony, assessing his demeanor, and viewing the exhibits about which Doane testified, the Court finds that Doane's testimony regarding Falana's role with respect to the '789 Patent lacks veracity and is not credible, and misled the Court regarding Falana's role in the KDI Project and the conception of the claimed invention in the '789 Patent.

11

(5:08 CV 720)

      B.    Seed's Testimony

*The White Paper*

1. Seed hired Falana to conduct research and synthesize compounds that would achieve the KDI Project's goals.

2. Seed testified at trial that he prepared a "white paper" which contained Seed's ideas for synthesizing the chemical compounds of interest for the KDI project **before** Falana arrived at KSU in 1998. The original "white paper," dated 10/19/97. was produced at trial.

3. The Court examined the original "white paper" at trial. Defendants' Ex. D (original). It appeared to the Court that a different pen was used to date the document "10/19/97" than was used to record the contents of the "white paper."

4. After considering the testimony of Seed and examining his demeanor and credibility, examining the original "white paper," and also considering Seed's testimony concerning the dates Seed inserted in Falana's research notebooks, *infra*, the Court finds Seed's testimony that he prepared the "white paper" before Falana's arrival at KSU in 1998 and gave the "white paper" to Falana upon his arrival at KSU, lacks veracity and is not credible, and misled the Court regarding Falana's role in the KDI Project and the conception of the claimed invention in the '789 Patent.

*Falana's research notebooks*

1. Seed required Falana to leave his research notebooks from the KDI Project at KSU. Seed testified at trial: "I mean if we were going to publish at a later date, then I would need

12

(5:08 CV 720)

those notebooks.  I can't publish without his notes."  Tr. p. 406.

2.     Since Falana left KSU and throughout discovery in this case, KSU was in possession of

       Falana's original research notebooks.

3.     At his deposition, Seed testified that all of the entries in Seed's own research notebook

       were made by him and that no one else was permitted to write in his research notebooks.

       Seed expected his graduate students and post-docs, including Falana, to safeguard their

       research notebooks in the same manner.  Tr. pp. 408-09.

4.     As was expected by Seed, and of professionally trained scientists, generally, all entries in

       Falana's research notebook were made by Falana himself. No other person, while Falana

       was at KSU, made any entries into his research notebooks.  Tr. pp. 197-98.  When Falana

       turned his notebooks over to Seed when Falana departed KSU in September 1999, there

       were no notations, initials or dates in those notebooks made by anyone but Falana, Tr. pp.

       200-203.

5.     At Seed's deposition and consistent with Falana's trial testimony, Seed testified that the

       only time he looked at Falana's notebooks was when Falana was leaving KSU, which was

       in September 2009, and Seed stood by that answer at trial  Tr. p. 409.  Doane asked Seed

       to "actually sign and date all the pages just in case we were going to do something with

       them in the future."  Tr. p. 409.

6.     Seed signed and dated certain pages in Falana's research notebooks.  The pages in

       Falana's research notebooks with Seed's signature all reflect the dates 12/8/98 or 2/5/99.

       The pages signed by Seed and dated 12/8/98 are all entered in blue ink.  The pages signed

(5:08 CV 720)

by Seed and dated 2/5/99 are all entered in red ink.  Both dates precede Falana's departure

from KSU in September 1999.  Seed had no explanation why he signed and dated some

pages and not others in Falana's research notebooks.  Tr. p. 339.

7.      Seed admits Falana's research notebooks contains Seed's name and dates that Seed

inserted into Falana's notebooks.  When questioned by Falana's counsel at trial regarding

the conflict between Seed's deposition testimony that he did not sign and date Falana's

research notebooks until Falana left KSU in September 1999, while the dates that appear

in the notebooks pre-date Falana's departure, Seed testified as follows:

| | |
|---|---|
| Witness: | So they are dated [12-8-98]–it looks like a year earlier than he actually left for book 1.  And then it changes on page 51 to 2-5-99. . . . So that would also be before he left.  So it looks like my dates are wrong.  It looks like it was actually before he left.  So that's an error on my part.  Certainly I haven't changed the date.  The date is the date. |
| The Court: | You wrote the date in yourself, didn't you? |
| Witness: | Oh, yes, Your Honor, I did. |
| . . . . | |
| Wilson: | So as you sit here today, those dates simply don't correspond with what you told me a year ago, do they? |
| Witness: | No, they don't.  I have no explanation for that. |

Tr. pp. 410-12.

8.      Earlier in his trial testimony and also contrary to his deposition testimony, Seed testified

that he signed the notebooks on the dates reflected–either 12-8-98 or 2-5-99–while Falana

was still at KSU. In response to a question by the Court, Seed testified that in order to

sign and date Falana's notebooks on 12-8-98 and 2-5-99, Seed would have asked Falana

for his research notebooks.  Tr. pp.313-15.  However, the Court has found that Falana

safeguarded the integrity of his research notebooks and that Seed's initials and dates were

14

(5:08 CV 720)

not in Falana's research notebooks when Falana turned them over to Seed at Doane's request in September 1999.

9.     After considering the testimony of Seed at trial, Seed's deposition testimony, Falana's testimony, and examining Falana's original research notebooks, the Court concludes that Seed's shifting testimony that he signed and dated Falana's research notebooks before Falana left KSU is not credible.  The Court finds that Seed did not sign and date Falana's research notebooks on the dates reflected–12/8/98 or 2/5/99.  The Court finds that Seed falsified the entries in Falana's research notebooks by signing and back-dating Falana's research notebooks after obtaining the notebooks from Falana when Falana left KSU in September 1999.

*Seed testifies at trial that he gave incorrect answers at his deposition*

1.     Seed testified at trial that he had recently examined the transcript of his deposition a few days before trial at the request of his attorney, and responded to a question by the Court that the deposition contained no "major" errors– just a few "typos." Tr. p. 398.  The Court took a recess to give Seed additional time to review his deposition before continuing.  Tr. pp. 398-99.

2.     Upon resuming his testimony after the recess, Seed identified several portions of his deposition testimony that claimed were actually incorrect answers and not simply transcription errors.[5]  According to Seed's trial testimony, he gave incorrect answers in

---

[5]     The Court was careful to clarify with the witness the nature of the incorrect deposition transcript: "The Court: Well, incorrect in the sense that you didn't say it, or that it's incorrect that the answer was incorrect?  Witness: The answer was

15

(5:08 CV 720)

> the first 114 pages of his deposition testimony at p. 39 (Tr. pp. 401-02), p. 59 (regarding when during the KDI Project Falana left KSU) (Tr. p. 402); p. 61 and p. 75 (regarding dates in Seed's research notebook and the date Seed synthesized a compound) (Tr. p. 403).

3.   After considering Seed's trial testimony and deposition testimony and observing the demeanor of the witness and evaluating demeanor and his credibility, the Court concludes that Seed's testimony related to the progress of the KDI Project and Seed's and Falana's role in the project and conception of the claimed invention entirely lacks credibility.

*'789 Patent*

1.   In addition to testifying at trial that he gave a number of incorrect answers at his deposition, including when he signed and dated Falana's notebook, but Seed also testified at trial that the claims of the '789 Patent itself are not correct.

2.   Seed testified that the incorrect aspects of the '789 Patent begin with its prosecution history and extend to the novelty of the '789 Patent, itself:

> Wilson:     Well, let's go to paragraph 2 [of the examiner's statement].  "Claims 1 through 17 meet the criteria set out in PCT Article 33(2)-(4), because the prior art does not teach or fairly suggest by prior art.
> . . .
> The present invention has an additional group R4 attached to naphthalene ring, which R4 is a hydrocarbon.  The prior art only discloses doxycycline derivatives without substituted naphthalene ring."
> . . .
> Do you know whether this is the essence of the invention of the '789 Patent?
>
> Witness:    It certainly it [sic] not.

incorrect, Your Honor." Tr. p. 402.

16

(5:08 CV 720)

| | |
|---|---|
| Wilson: | It is not? |
| Witness: | In fact, it's wrong. |
| Wilson: | It's wrong? |
| Witness: | Well, it says R4 is a hydrocarbon.  Well, it's an oxygen connected to a hydrocarbon.  And it doesn't necessarily have to be just a hydrocarbon bond according to the patent. |

. . . .

| | |
|---|---|
| Wilson: | . . . Suppose we put instead of the prior art only, the work done by Seed that is the chemistry in the '789 application discloses dioxyline derivatives without substituted naphthalene ring?  Is that accurate? |

. . . .

| | |
|---|---|
| Witness: | That is inaccurate. |

. . . .

| | |
|---|---|
| Wilson: | So, Dr. Seed . . . isn't the novelty of the '789 Patent the discovery of a compound, let's say it's your compound for the sake of argument, Compound 9, which has dioxolane derivatives . . . with the substituted naphthalene ring? |
| Witness: | That's not the novelty.  The novelty is the independence of the helical twisting power with temperature. |
| Wilson: | Really?  And that's it?  That's the novelty? |
| Witness: | Well, that's the important feature as far as I'm concerned and Bill's [Doane] is concerned.  But obviously that is obtained by having substituted naphthalene derivatives. |
| Wilson: | A substituted naphthalene ring, right? |
| Witness: | Correct. |
| Wilson: | So you–you're saying that the fact that you prepared a compound, Compound 9, let's say, with a substituted naphthalene ring is nothing new? |
| Witness: | It was a new compound, but what we were–you know, again, what we were looking for was an independence of helical twisting power with temperature.  It may have been another derivative. |
| Wilson: | Well in that regard, will you look at the claims . . . in the '789 Patent, which I think you have there, and tell me whether the–there is any mention of this–of temperature independence in any of those claims? |
| Witness: | No. It is not mentioned in the claims. |

. . .

| | |
|---|---|
| Wilson: | It is your invention.  Can you just look at the claims that you are getting credit for and tell me if there is any mention in there of temperature– |
| Witness: | There is no mention whatsoever of independence of helical twisting power in the claims. |
| Wilson: | Or temperature independence? |
| Witness: | Or temperature independence. |

17

(5:08 CV 720)

| | |
|---|---|
| Wilson: | But there is chemically explicit in the claims, is there not, a substituted naphthalene ring? |
| Witness: | There is. |
| Wilson: | Compound 9,[6] and I'm sure you will tell me, has a substituted naphthalene ring? |
| Witness: | Yes, it does. |
| Wilson: | Compound 7[7] has a substituted naphthalene ring? |
| Witness: | Yes, it does. |

Tr. pp. 396-397; 415-18.

*Falana's work on the KDI Project*

1.      Seed was repeatedly evasive in his answers to questions relating to Falana's role in the

conception of the invention of the '789 Patent, even in response to direct questions by the

Court.  Seed repeatedly testified that there was no new chemistry in Falana's work and

that Falana's work was done entirely under Seed's direction, even though Seed also

testified that he expected Falana to think for himself and work independently.  For

example, with respect to Seed's testimony regarding synthesis of a particular chemical

compound by Falana:

| | |
|---|---|
| The Court: | When you say there is nothing new, you were directing him to do this? |
| Witness: | Yes, I'm saying there were no new ideas, Your Honor. |
| The Court: | Well, why did you direct him to do it? |
| Witness: | In terms of the synthesis, there is nothing new.  The ideas laid out in the White Paper encompass these types of derivatives, Your Honor. |
| The Court: | I still don't understand why you directed him to do it if there is nothing new here. |

---

[6]      As previously found by the Court and not disputed by the parties, Compound 9 was synthesized by Seed after Falana's departure from KSU.

[7]      As previously found by the Court and not disputed by the parties, Compound 7 was synthesized by Falana while working on the KDI Project before his departure from KSU.

18

(5:08 CV 720)

| | |
|---|---|
| Witness: | Perhaps I should rephrase.  The chemistry is not unusual in any way.  And there is no idea that is different from the original idea laid out in the White Paper. |
| The Court: | And then why did you direct him to do it if there is no new idea?  That's my question. |
| The Witness: | Perhaps I should say we were looking at all possibilities, Your Honor.  The different types of chains we could have, the different– |
| The Court: | Because you thought there might be something interesting that could develop? |
| Witness: | Yes, Your Honor. |
| The Court: | Thank you. |

Tr. pp. 321-22.

2.      Seed testified concerning various documents exchanged and meetings held among

members of the KDI Project team.  Seed's testimony regarding one such document

exchange and meeting is reflected in the trial transcript at page 362.

| | |
|---|---|
| The Court: | What document are we talking about? |
| . . . . | |
| The Court: | 006? |
| . . . . | |
| Mr. Gaum: | Looking at the creation date of April 13, 1998, does that refresh your recollection of when you would have done this? |
| Witness: | That would certainly be in the time frame I would be expecting to right [sic] this up. |
| The Court: | And to whom was it delivered? |
| Witness: | It would have been Drs. Doane and Khan at one of our research meetings. |
| The Court: | Not Dr. Falana? |
| Witness: | Dr. Falana would have been there as well. |
| The Court: | Why didn't you mention him when I asked him [sic] that question? |
| Witness: | I'm sorry. |
| The Court: | Well your credibility is at stake just like everybody else's.  The fact that you are a Ph.D. and a brilliant man doesn't mean that I'm going to believe everything you say.  When I ask you a question and you omit Dr. Falana from who was there, I begin to suspect your credibility.  Why don't you tell me straight up when I ask you a question like that. . . . |

Tr. pp. 362-63.

(5:08 CV 720)

3.     When considering the testimony of Seed in its entirety, both with respect to the content and demeanor of the witness, it was readily apparent to the Court that Seed's testimony, utterly lacked veracity and credibility, and was entirely shaped by the witness' effort and intention to minimize and downplay and mislead the Court regarding the role of Falana in the KDI Project and the conception of the invention claimed in the '789 Patent in order to defeat Falana's inventorship claim.

C.     KSU and KDI's Defense of Falana's Lawsuit.

1.     KSU and KDI entered into a joint defense agreement to facilitate KSU's and KDI's common defense interest with respect to plaintiff's inventorship claim and to allow sharing of defense materials and privileged communications between and among KSU, KDI, Doane, Khan, Seed, and their respective counsel without waiving the attorney-client privilege.  ECF 136 and 137.

2.     KDI and KSU and their respective counsel worked together on the defense of this case, including trial and witness preparation, both before and after KDI, Doane, and Khan were dismissed from the case.  ECF 136 and 137.

3.     It was the understanding of counsel for KDI that KSU had agreed to pay KDI's legal fees. ECF 137.

4.     As of November, 2012, KSU's legal fees charged by its counsel Hahn Loeser was resulted from approximately 2,300 billable hours and totaled approximately $350,000 at a rate of $175 an hour because KSU is an Ohio public university.  ECF 136.  These fees do not include KDI's attorney fees and costs for this.

20

(5:08 CV 720)

## PLAINTIFF'S MOTIONS FOR ATTORNEY FEES

Plaintiff initially moved for attorney fees in the sum of $211,594.66 plus costs. Defendants opposed plaintiff's motion (ECF 105) and plaintiff replied (ECF 106).

Plaintiff filed a supplemental motion for attorney fees in the sum of $46,462 for attorney fees related to defendants' appeal, plus allowable costs for appeal.  ECF 122.  Defendants opposed plaintiff's supplemental motion for fees (ECF 123 and 124), to which plaintiff replied (ECF 125).

After the Court allowed limited discovery, plaintiff filed a second supplement to his application for attorney fees and costs (ECF 138), which defendants opposed (ECF 139).

The Court concludes, and the parties agrees, that a hearing is not required in order for the Court to rule on plaintiff's motions for attorney fees.

## TITLE 35 U.S.C. § 285

Title 35 U.S.C. § 285 provides a district court with discretion to award reasonable attorney fees to a prevailing party if the court determines that the case is "exceptional."[8] Section 285 does not bar the district court from awarding fees for the entire case, including any subsequent appeals.  *Therasense, Inc. v. Becton, Disckinson and Co.*, 745 F.3d 513, 517 (Fed. Cir. 2014) (citing *Comm'r, INS v. Jean*, 496 U.S. 154, 160 (1990) and *Rohm & Haas Co. v. Crystal Chemical Co.*, 736 F.2d 688, 692 (Fed. Cir. 1984)).

With respect to the first factor, the Court ruled that Falana was a co-inventor of the '789

---

[8]     35 U.S.C. § 285: "The court in exceptional cases may award reasonable attorney fees to the prevailing party."

21

(5:08 CV 720)

Patent, and that conclusion was affirmed by the Federal Circuit. Plaintiff is the prevailing party both at the district court and appellate court.

The Court's conclusion that plaintiff is the prevailing party both at the district court and before the Federal Circuit does not automatically entitle plaintiff to attorney fees pursuant to the fee shifting provision of § 285. The Court must next determine if the case is exceptional. Even if the Court determines the case is "exceptional," Section 285 does not require the Court to award attorney fees, but authorizes the Court to do so in its discretion.

A.     Exceptional Case

The Patent Act was amended by Congress in 1946 to add a discretionary fee shifting provision that enabled district courts to address "unfairness or bad faith with respect to the conduct of the losing party, or some other equitable consideration of similar force" which makes a case so unusual as to warrant fee shifting. *Octane Fitness, LLC v. Icon Health & Fitness, Inc.,* 134 S.Ct. 1749, 1753 (2014) (quotations and citations omitted).[9] The original fee shifting provision was subsequently amended to include the "exceptional case" language  now found in § 285. The "exceptional case" language was added to the fee-shifting provision "for purposes of clarification only" and the amended provision did not substantively alter the original meaning of the statute. *Id.*

---

[9]     The original fee shifting provision, found at 35 U.S.C. § 70, provided that the court "may in its discretion award reasonable attorney fees to the prevailing party upon entry of judgment in any patent case." *Octane Fitness,* 134 S.Ct. at 1753 (quoting 35 U.S.C. § 70 (1946 ed.)).

(5:08 CV 720)

The Patent Act creating the fee shifting provision of § 285 does not define the term "exceptional."  Therefore, the term is construed "in accordance with [its] ordinary meaning." *Octane Fitness,* 134 S.Ct. at 1756 (quoting *Sebelius v. Cloer*, 133 S.Ct. 1886, 1893 (2013)).

The word "exceptional," according to respected dictionaries such as Webster's and the Oxford English Dictionary, means "uncommon," "rare," "not ordinary," "out of the ordinary course," and "unusual."  An "exceptional case," therefore, "is simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated."  *Octane Fitness*, 134 S.Ct. at 1756.  There is no precise rule or formula for making the discretionary determination of whether a case is exceptional.  When making that determination, the district court may take a "holistic and equitable" approach in light of the "totality of the circumstances" of a case, considering a variety of factors such as motivation, objective unreasonableness, and the need in a particular circumstance to advance considerations of compensation and deterrence. *Octane Fitness*, 134 S.Ct. at 1754 and 1756  (citations and quotations omitted).

Conduct which may support an exceptional case finding under § 285 is not limited to sanctionable conduct.  "A district court may award fees in the rare case in which a party's unreasonable conduct–while not necessarily independently sanctionable–is nonetheless so "exceptional" as to justify an award of fees."  *Octane Fitness*, 134 S.Ct. at 1757.  Rather, the Supreme Court in *Octane Fitness* found the fee-shifting provision of § 285 to be more akin to the general exception to the American rule against fee-shifting–"an exception 'inherent' in the 'power of the courts' that applies for 'willful disobedience of a court order' or 'when the losing

23

(5:08 CV 720)

party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *Octane Fitness*, 134 S.Ct. at 1758 (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258-59 (1975)).

B.     Reasonable Attorney Fees

Once the Court determines that a case is exceptional pursuant to § 285 and that an award of attorney fees is appropriate, the Court must next determine "reasonable attorney fees." The amount of reasonable attorney fees lies within the sound discretion of the Court.  *Takeda Chemical Ind. v. Mylan Laboratories, Inc.*, 549 F.3d 1381, 1390 (Fed. Cir. 2008).  Although the award of a total amount of the fee request is unusual, there are certain circumstances where the misconduct is such that an award of attorney fees for the entire litigation may be imposed. *Takeda Chemical Ind.*, 549 F.3d at 390-91.  Circumstances of a case and principles of fairness may support a conclusion by the court that it would be "grossly unjust" to require the prevailing party to bear the burden of its own counsel.  *Synthon IP, Inc. v. Pfizer, Inc.*, 484 F.Supp. 2d 437, 442-43 (E.D. Va. 2007) (*affirmed Synthon IP, Inc. v. Pfizer, Inc.,* 281 Fed. Appx. 995 (C.A. Fed. (Va.) 2008)).

The starting point for determining a reasonable attorney fee is the number of hours reasonably expended multiplied by a reasonable hourly rate.  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  This "lodestar" calculation provides an objective basis from which to make an initial estimate of the value of a lawyers services.

The hourly rate for calculation of the lodestar depends on the practice area and venue. Attorneys who practice in complex areas of law, such as patent law, command a higher hourly

24

(5:08 CV 720)

rate because of the specialized nature of their work.  *See Pierce v. Underwood,* 487 U.S. 522, 572 (1988); *Saint-Gobain Autover USA v. Xinyi Glass N.Am., Inc.,* 707 F.Supp.2d 737, 759-60 (N.D. Ohio 2010).[10]  The market rate in a specialized area of law, such as patent law, in a particular venue is an appropriate rate to consider in calculating the lodestar in order to encourage competent representation.  *B&G Mining, Inc., v. Dir. OWCP*, 552 F.3d 657, 662 (6th Cir. 2008). This is particularly important in an area of law such as intellectual property where litigation is very expensive and opposing parties may have widely disparate resources.

**EXCEPTIONAL CASE ANALYSIS-DISTRICT COURT ACTION**

During the course of a four day bench trial, the Court heard extensive testimony from the named inventors of the '789 Patent, and from plaintiff Falana.  All of the named inventors, Seed, Doane, and Khan, testified in defending against Falana's claim that he should be included as a named inventor on the '789 Patent.

The Court carefully listened to the testimony of the witnesses and was able to directly assess their demeanor during testimony.  The Court also questioned the witnesses directly.  As a consequence, the Court, as a fact finder, was able to assess the witnesses' veracity and credibility. In addition, the Court examined original documents, which was important in this case for certain critical documents because copies were insufficient to make a full assessment of the document.

One of the defendants in this case was a named inventor on the '789 Patent at issue in this case–Alexander Seed.  It was clear to the Court that Seed's entire testimony was shaped by an

---

[10]      Both parties provided the Court with survey information from the American Intellectual   Property Law Association (AIPLA) survey of hourly rates for 2008 as published in 2009.

(5:08 CV 720)

effort to downplay and mislead the Court regarding Falana's role in the KDI Project and

conception of the invention claimed in the '789 Patent.  The incorrect, inaccurate, evasive and

misleading testimony given by Seed at trial was breathtaking in its scope.  Seed's trial testimony

directly contradicted his earlier deposition testimony on multiple matters, and his facile changes

of story with no apparent explanation made it clear to the Court that Seed was willing to deliver

any testimony that Seed believed would defeat Falana's co-inventor ship claim.

Even more troubling was Seed's incredible testimony about Falana's research notebooks.

Afer after examining original documents and considering the multiple versions of Seed's

testimony regarding when Seed signed and dated Falana's notebooks, the Court found that Seed

altered, falsified, and back-dated critical original documents relating to Falana's inventorship

claim.

As detailed in the Court's findings of fact, Seed's facile testimony was expansive.

According to Seed, even the novelty and claims of the '789 Patent, of which he is a named

inventor, are not correct.  Seed's arrogance and disregard for the integrity of our patent system

and the judicial system tasked with resolving disputes regarding patent inventorship was apparent

from Seed's testimony regarding the novelty of the '789 Patent and the claimed invention.  Seed

acknowledged at trial that temperature independent helical twisting power was not claimed in

any of the claims of the '789 Patent.  Undeterred, Seed testified to the Court that, "as far as I'm

concerned and Bill's [Doane] concerned," the novelty of the '789 Patent was not the compound

claimed, but the independent helical twisting power of a compound.  Seed's testimony regarding

the novelty of the '789 Patent was not grounded in the claim language of the patent, but in his

(5:08 CV 720)

own self-serving viewpoint in an effort to mislead the Court and exclude Falana's Compound 7 from the claim.

The Court recognizes that credibility can be an issue with any witness.  However, it was apparent to the Court at the time of the trial that the scope of Seed's facile and glib testimony regarding facts relevant to the Court's inventorship determination was focused on shaping his testimony to defeat Falana's inventorship claim, and not to provide the Court with truthful testimony to the best of his recollection.

The scope and nature of Seed's misconduct and unethical and unprofessional behavior at trial, and falsification and alteration of original relevant documents, was unusual and objectively unreasonable by any standard.  Thankfully, the magnitude of the misleading testimony and alteration of documents demonstrated by Seed in this case is out of the ordinary and not a commonly seen in the testimony of trial witnesses and conduct of parties.  If it were otherwise, our system for resolving parties' disputes by a fact finder upon consideration of truthful witness testimony would be severely impaired.  Particularly troubling in this case is the damage that such misconduct by a party and a witness can inflict on the integrity of our intellectual property system and the resulting damage to the public interest and trust in the correct identification of inventors and award of patents for novel inventions.

Alexander Seed is an intelligent man.  He is a named inventor on the '789 Patent, a faculty member at Kent State University, and a party to this litigation.  The scope and nature of Seed's misconduct as a party and a witness in this case was so pervasive that it cannot be construed as a mere isolated or inadvertent error or misstatement.

27

(5:08 CV 720)

It is rare for such litigation misconduct be so apparent and documented as was Seed's

misconduct as a party and witness in this case.  *See Aptix Corp v. Quickturn Design Systems,*

*Inc.*, 269 F.3d 1369, 1374 (C.A. Fed. 2001). For all of these reasons and considering the totality

of the circumstances, the Court concludes that Seed's misconduct as a witness and a party in this

case warrants a determination by this Court, in the exercise of its discretion, that this case is

exceptional within the meaning of 35 U.S.C. § 285 and the Supreme Court's ruling in *Octane*

*Fitness*.[11]

Seed's misconduct as a party and a witness in this case alone warrants a determination by

the Court that this case is exceptional.  However, Seed was not the only defense witness  in this

case willing to shape their testimony in order to defeat Falana's inventorship claim.  The

testimony of Doane, a named inventor and dismissed party to this case, also lacked veracity and

credibility.  Particularly troubling to the Court was the letter Doane authored on KSU letterhead

---

[11]     Even prior to *Octane Fitness*, litigation misconduct and unprofessional behavior
alone may suffice to make a case exceptional under § 285. *MarcTec LLC v.
Johnson & Johnson*, 664 F.3d 907, 919 (C.A. Fed. 2012); *Aptix Corp v. Quickturn
Design Systems, Inc.*, 269 F.3d 1369, 1374-75 (C.A. Fed. 2001) ("The record
amply supports the district court's finding that Dr. Mohsen submitted the
seventeen pages of his 1989 notebook to the court after adding new material to the
signed and dated pages. . . .Without question, fraud and misconduct make this
case exceptional under 35 U.S.C. § 285 and warrants full compensation of
[defendant's] reasonable attorney fees and costs.); *Rambus, Inc. v. Infineon
Technologies AG*, 318 F.3d 1081, 1106 (CA. Fed. 2003) (false and misleading
testimony by plaintiff's employees); *Monolithic Power Systems v. O2 Micro
International Limited*, 726 F.3d 1359 (C.A. Fed. 2013) ( misrepresentation of
relevant dates to mislead the court); *IUC Med., Inc. v. Alais Med. Sys., Inc.*, 5558
F.3d 1368, 1380 (C.A. Fed. 2009) (affirming award of attorney fees where a party
made multiple, repeated misrepresentations to the court).

(5:08 CV 720)

in his capacity as director emeritus of KSU's Liquid Crystal Institute to a federal agency–the INS.

According to Doane's trial testimony, his letter to the INS incorrectly stated that Falana was the sole organic chemist working on the KDI Project, that Falana's work led to the '789 Patent, and that the '789 Patent was currently being prepared.  At trial, Doane testified that Falana was not the sole organic chemist working on the KDI Project, that Falana's work did not lead to the '789 Patent, and that there was actually no patent being prepared.  According to Doane, at the time he wrote the letter to the INS, the patent was "in our minds."

Doane's statements regarding Falana's role in the KDI Project and the '789 Patent are clearly significant and relevant to the INS's evaluation of Falana's immigration status and to this Court's determination of Falana's status as an inventor of the '789 Patent, although for different reasons.  The correctness of Doane's statements of fact to the INS are important irrespective of any legal conclusion regarding inventorship that may or may not be drawn from those statements.

At trial, Doane testified that his statements to the INS regarding Falana's role relative to the project and patent were factually incorrect and that he had "different standards" regarding statements made to the INS and to the Court regarding Falana's role.  Different standards, indeed. All three statements are simple statements of fact.  Falana was or was not the sole organic chemist.  There was or was not a patent currently being prepared. At trial, Doane testified that both statements were not true.  Doane would apparently have the Court believe that he made those incorrect statements to the INS in order to do Falana "a favor," and that it is acceptable to make incorrect statements to a federal agency–or court–depending upon motivation.  Basically, Doane put himself in position of admitting that he made false statements to the INS or was now

29

(5:08 CV 720)

making false statements to the Court.

Doane's relationship to KSU and KDI are inextricably intertwined as the Court found, *supra.* In addition, KSU and KDI were parties to a joint defense agreement and their counsel and witnesses had a shared interest in defeating Falana's inventorship claim that continued from the inception of the litigation through trial. It is apparent to the Court, after considering Doane's testimony and evaluating his demeanor and credibility and considering the totality of the circumstances that Doane's testimony regarding Falana's role in the KDI Poject and conception of the invention claimed in the '789 Patent lacks veracity and credibility, and was shaped by a shared interest and motivation in defeating Falana's inventorship claim.

For the same reasons discussed above with respect to Seed's testimony, the willingness of a witness to make incorrect statements regarding matters that go to the very core of the issues before both the INS and the Court, depending upon the motivations of the witness at the time, is unusual in its scope and undermines the integrity of the immigration system, the judicial system, and the patent system. Seed's misconduct as a party and witness is alone sufficient to support the Court's conclusion that this case is exceptional, and Doane's misconduct as a witness and dismissed party further supports that conclusion.

## ATTORNEY FEE ANALYSIS-DISTRICT COURT ACTION

After concluding that this case is exceptional, the Court must then determine whether an award of attorney fees is appropriate, and if so, what constitutes a reasonable fee in this case.

A.    <u>Award of Fees is Appropriate</u>

In this case, in the context of all of the evidence, the Court determined that the testimony

30

(5:08 CV 720)

of defendants' witnesses at trial offered to defeat plaintiff's claim was not credible and lacked veracity. Further, the Court found that a witness and a party in this case altered and falsified original documents in this case that were highly relevant to the Court's inventorship determination, and that the litigation misconduct of a party and witnesses in this case warranted a conclusion by the Court that this case was exceptional.

Plaintiff is a single individual without the resources of a large institution such as KSU to litigate the issue of inventorship. Plaintiff prevailed in his inventorship claim at both the trial and appellate level.  Plaintiff's successful claim for correction of inventorship resulted in no monetary award to plaintiff.  A significant commitment to the integrity of our patent system was required by Falana to persevere against a large institution and witnesses who were willing to make inaccurate and incorrect statements and to falsify documents in order to defeat his claim to be named as an inventor on a patent which the defendants assert has no commercial value to KDI or KSU.

Considering the totality of the circumstances in this case, the Court concludes that an award of attorney fees in this case is both justified and warranted in order to prevent a gross injustice, and to protect the integrity of our patent system by ensuring competent representation *See Nilssen v. Sylvania,* 528 F.3d 1352, 1359 (Fed. Cir. 2008) (litigation misconduct sufficient grounds to award attorney fees to prevent gross injustice).

B.    Plaintiff's Request for Fees and Costs

Plaintiff seeks attorney fees in the sum of $211,594.66.  In support of the motion for fees, plaintiff submits the declarations of Attorney Bruce Wilson (ECF 104-1) and Jon Troyer (ECF

31

(5:08 CV 720)

104-11), as well as time logs prepared by Attorney Wilson (ECF 104-2) and Attorney Troyer
(ECF 104-4).

To assist with the technical subject matter of the '789 Patent, Attorney Wilson secured
the assistance of Attorneys Edwin Sisson and Michelle Christeon, both admitted to practice
before the U.S. Patent and Trademark Office.  Other members of Attorney Sisson's firm, a
technical expert and administrative assistant, recorded hours in this case, but those hours are
listed as "no charge" and are not reflected total invoice from Attorney Sisson's firm.  The
declaration of Attorney Sisson (ECF 104-12), and time logs for Attorneys Sisson and Christeon
(ECF 104-5), are attached to plaintiff's motion for attorney fees.

Attorney Wilson undertook the representation of plaintiff Falana in January 2007. The
single page fee agreement provides for a rate of $250 per hour, to be paid by Dr. Falana "as and
when you are able."  This language in the fee agreement reflects Attorney Wilson's
understanding of Dr. Falana's circumstances in terms of Falana's modest wages and
responsibility as the sole source of financial support for two young children.  ECF 104-1 and
104-3.  Prior to being represented by Attorney Wilson, plaintiff Falana was represented by
Attorney Dorman.  An invoice for legal fees incurred by Dr. Falana for Attorney Dorman's
services is attached to plaintiff's motion for attorney fees at ECF 104-6.

In addition to an award of fees pursuant to 35 U.S.C. § 285, plaintiffs also seek costs in
the sum of $1,912.80 pursuant to Fed.R.Civ.P. 54(d)(1).  Rule 54(d)(1) provides:

> Unless a federal statute, these rules, or a court order provides otherwise,
> costs–other than attorney fees–should be allowed to the prevailing party.

32

(5:08 CV 720)

Plaintiff has submitted his bill of costs on form AO133 at Exhibit 10 to plaintiff's motion for attorney fees.  The underlying documentation for plaintiff's bill of cost is contained at ECF 104-8 and 104-9.  Defendants have indicated that they do not object to plaintiff's bill of costs.

C.    <u>KSU and Seed's Objection to Plaintiff's Motion for Fees</u>[12]

Defendants KSU and Seek object to the fees requested by plaintiff for the reasons that follow: 1) Attorney Wilson's hourly rate of $375 is not reasonable when his engagement letter with Dr. Falana sets his rate at $250 and no multiplier or enhancement should be permitted; 2) KSU and Seed are not responsible for fees related to dismissed defendants KDI, Doane, and Khan; 3) multiple time entries are vague and lack specificity; and 4) billing entries older than six months before lawsuit on March 22, 2008 should be disallowd.

1.    The Court will address defendants' objection regarding Attorney Wilson's hourly rate, below.

2.    Defendants' objections to fees related to dismissed defendants KDI, Doane, and Khan are well taken, in part.  Defendants have identified the time log entries which they claim should be disallowed.  ECF 105-3 and 105-4.

Falana's claims against the inventors and owners of the '789 Patent, and the legal work and discovery related to those issues are so intertwined among KSU, KDI, Doane, Khan, and Seed as to be inseparable.  KSU and KDI both own the '789 Patent. The research, discovery, trial preparation, and other litigation efforts involved in plaintiff's prosecution of his inventorship claims was essentially the same whether KDI, Doane and Khan were originally sued as parties or

---

[12] Defendants have no objection to plaintiff's request for costs.  ECF 105.

33

(5:08 CV 720)

not. In fact, the inventorship issues and the interests of KSU, KDI, Doane, Khan and Seed were so aligned that they entered into a joint defense agreement.

As reflected in the Court's finding of fact, counsel for KDI, Doane and Khan worked collaboratively and in concert with KSU throughout this case, including preparation for trial. KDI exhibits and Doane and Khan's testimony were as relevant and critical to KSU's defense at trial as was Seed's testimony.

Unlike Seed, Doane and Khan were willing to concede to the addition of Falana as a named inventor on the '789 Patent. As a consequence, KDI, Doane and Khan were dismissed from this case as parties. The only possible aspect of this case *solely* related to KDI, Doane and Khan and not inextricably intertwined with plaintiff's inventorship claim against KSU and Seed is KDI, Doane, and Khan's motion to be dismissed from the case. Accordingly, the Court will disallow time entries that reflect work that is *solely* related to KDI, Doane, and Khan's motion to dismiss. This disallowance of time entries on work *solely* related to KDI, Doane's and Khan's motion to dismiss is unrelated to and does not change the Court's conclusions regarding the cooperation and interrelationship between KSU and KDI and their joint interest and motivation in defeating Falana's inventorship claim.

Accordingly, the following time entries will be disallowed by the Court as solely related to KDI, Doane, and Khan's motion to dismiss:

| *Attorney Bruce Wilson:* | Date | Time (hrs) |
|---|---|---|
| | 7/1/2008 | 1.5 |
| | 7/3/2008 | 1.5 |
| | 7/9/2008 | 0.67 |
| | 7/10/2008 | 1.5 |

(5:08 CV 720)

|  |  |  |
|---|---|---|
|  | 7/11/2008 | 3.0 |
|  | 7/18/2008 | 2.5 |
|  | 7/26/2008 | 1.0 |
|  | 8/9/2008 | 0.5 |
|  | 8/28/2008 | 1.0 |
|  | 8/29/2008 | 1.0 |
|  | 8/30/2008 | 0.25 |
|  | 9/15/2008 | 1.0 |
|  | 9/19/2008 | 0.75 |
|  | 11/26/2008 | 0.5 |
|  | 12/9/2008 | 0.5 |
|  | 12/16/2008 | 2.0 |
|  | 12/18/2008 | 2.0 |
|  | 12/18/2008 | 5.0 |
|  | 12/19/2008 | 0.8 |
|  | TOTAL | 26.97 |
|  |  |  |
| *Attorney Jon Troyer:* | 7/11/2008 | 4.0 |
|  | 7/14/2008 | 1.5 |
|  | 7/18/2008 | 7.5 |
|  | 9/15/2008 | 1.5 |
|  | 12/9/2008 | 1.0 |
|  | 12/16/2008 | 5.0 |
|  | 12/18/2008 | 6.5 |
|  | 1/12/2009 | 3.0 |
|  | 1/13/2009 | 5.5 |
|  | 1/14/2009 | 2.0 |
|  | 1/15/2009 | 2.5 |
|  | 1/16/2009 | 4.5 |
|  | TOTAL | 44.5 |

3.    Defendants also object to attorney time entries which defendants characterize as vague.  KSU and Seed have identified entries on Attorneys Wilson and Troyer's time logs which they contend are vague and should be disallowed.  *See* ECF 105-5 and 105-6.

The Court has reviewed every entry that the defendants claim are vague and should be disallowed.  Time logs need only be sufficiently detailed so as to allow the Court to determine the reasonableness of the hours claimed in the overall context of the case.  After reviewing the

35

(5:08 CV 720)

entries identified by defendant in the context of the entire time logs–which on the whole are sufficiently detailed–and the docket of the case, the Court concludes that purpose of the time expended for those entries are reasonably apparent and are allowed.

The Court notes, ironically, the defendants argue that the 7/18/2008 entry on Attorney Wilson's time log is too vague and should be disallowed. However, this entry was apparently clear enough for defendants to understand it because they also argue that this entry relates solely to KDI, Doane and Khan and should be disallowed on that basis. See ECF 105-3 and 105-4. The Court, in examining the "vague" entry at 7/18/2008 in the context of the docket and entire time log, also found it clear enough and as reflected above, has accepted defendants' argument that the 7/18/2008 entry should be disallowed as solely related to KDI, Doane and Khan's motion to dismiss.

The entries on Attorney Wilson and Troyer's logs that are identified by defendants as too vague are no more vague than the 7/18/2008 entry, and are sufficiently detailed for the Court to evaluate the reasonableness of the entry when examined in the context of the entire case and time log. Accordingly, the Court finds defendants objections to the time logs based on vagueness are without merit, and those entries are allowed.

4.    *2006 Entries*

Defendants also argue that entries older than six months before the lawsuit was filed in 2008 should be disallowed. Entries for Attorneys Wilson and Troyer begin in mid-2006. The retention agreement between Attorney Wilson and plaintiff was prepared in December 2006 and executed by Falana early in 2007. The time logs reflect that this time–approximately six months

(5:08 CV 720)

in advance of the retention agreement–was related to Attorney Wilson's assessment of the case and determination of whether he would represent Falana. Further, the time expended by Attorneys Wilson and Troyer to make that assessment is very modest–less than sixteen hours. The purpose of § 285 is to compensate the prevailing party for monetary outlays in connection with the lawsuit. Accordingly, the Court concludes plaintiff's attorney fees prior to the retention agreement between plaintiff and his counsel should be allowed as a necessary and reasonable outlay by plaintiff in pursuit of his inventorship claims.

D.     Attorney Fee Award

        The Court has examined all of the time log entries for all attorneys for which plaintiff seeks an award of legal fees. Except as expressly excluded, the Court finds that the time log entries and hours expended to be reasonable, and those hours are allowed and will be used by the Court in its calculation of reasonable attorney fees pursuant to § 285.

        1.     Attorney Bruce Wilson

        The Court has examined the affidavit and time log of Attorney Bruce Wilson. ECF 104-1 and 104-2. Attorney Wilson was admitted to practice in Ohio in 1964. He is admitted to practice before the United States Supreme Court and multiple federal circuits and district courts. He is also registered to practice before the U.S. Patent and Trademark Office.

        In addition, Attorney Wilson is a member of numerous intellectual property lawyer associations, as well as associations related to the practice of law in federal court. See ECF 104-1. Attorney Wilson also teaches Intellectual Property Litigation as an adjunct faculty member at the Akron School of Law.

37

(5:08 CV 720)

Attorney Wilson's affidavit reflects that at the time he entered his fee agreement with plaintiff Falana for an hourly rate of $250, Attorney Wilson was aware that his client was a man of modest means financially responsible for two young children.  The fee agreement itself reflects these factors in that Attorney Wilson expressly allows Falana the latitude to pay his fees "as and when you are able."

KSU argues that Attorney Wilson's claimed fee of an hourly rate of $375 is not reasonable because: 1) $250 represents the actual market rate; 2) the legal analysis Attorney Wilson sought from Attorney Sisson reflects that Attorney Wilson did not have the necessary expertise to handle the case himself.

The Court is not persuaded by KSU's arguments that $250 represents the actual market rate for Attorney Wilson and that $375 does not reflect a reasonable hourly rate for Attorney Wilson.  The determination of a reasonable attorney fee begins with the lodestar rate. The hourly rate in the fee agreement between Attorney Wilson and Falana is not a proper basis for reducing the lodestar rate, although it may be taken into account.  *See Bywaters v. U.S.*, 670 F.3d 1221, 1231-32 (C.A. Fed. 2012); *Blancahrd v. Bergeron*, 489 U.S. 87, 93 (1989) (if fee agreement provides less than a reasonable fee calculated using the lodestar method the defendant should nevertheless be required to pay higher amount to prevailing party under 42 U.S.C. § 1988 in fee shifting provision).

Defendants attach AIPLA data to assist the Court in determining a lodestar rate for Attorney Wilson.  ECF 105-1.  The lodestar rate is the "guiding light" in calculating reasonable attorney fees under fee shifting statutes. *Bywaters v. U.S.*, 670 F.3d at 1228-29 (quoting *Perdue*

38

(5:08 CV 720)

*v. Kenny A. Ex rel. Winn,* 130 S.Ct. 1662, 1672 (2010)).

The AIPLA data reflects that the median (midpoint) billing rate in 2008 for a solo

practitioner in the central states, including Ohio, was $250.  The third quartile of that range is

listed as $288.  For attorneys age 60 or older, the third quartile rate is listed as $333.[13]

KSU's argument that Attorney Wilson does not possess the expertise or experience to

support a reasonable hourly rate of $375 is belied by its own exhibits, AIPLA data, and plaintiff's

successful outcome.  Patent practice literature submitted by KSU in support of its position

identifies the question of patent inventorship as "one of the most complex areas of patent law."

ECF 124-4.  In this "most complex area of patent law," Attorney Wilson possessed the skill and

expertise to prevail for his client before this Court and the Federal Circuit.

Second, Attorney Wilson did so with a legal team that was less than half the size of

KSU's legal team and at a fraction of the cost.  KSU argues that Wilson's retention of Attorney

Sisson proves that Attorney Wilson did not have the skill or expertise to handle this case and is

therefore undeserving of his claimed fee.  The Court disagrees.  KSU and KDI themselves were

represented by multiple lawyers and legal professionals, however, that does not mean that KSU's

lawyers lack skill and expertise, but reflects the fact that patent litigation is a significant endeavor

requiring more than one or two lawyers to get the job done.

---

[13]    The Court estimates Attorney Wilson's age to be 60 or older based on the year of
his admission to the Ohio Bar. The increased rate in the third quartile for attorneys
in this category generally reflects increased time in practice, and a commensurate
increase in expertise and experience.

39

(5:08 CV 720)

Attorney Wilson chose his team carefully and selected them for their expertise–in the same manner and for the same reasons that KSU's lawyers selected their large legal team. Attorney Wilson's small team was successful against KSU and KDI's larger and more expensive teams, incurring only a fraction of the billable hours and actual fees charged by KSU's counsel.[14] Attorney Wilson's choice of his legal team and their efficient results does not reflect a lack of skill and expertise on Attorney Wilson's part, but ultimately reflects superior understanding, expertise and skill with respect to both litigation skills and substantive knowledge, as well as the management of the prosecution of plaintiff's claims in an efficient and successful manner.

Additionally, Attorney Wilson's professional activities reflect he is extensively involved in his field and continuing professional improvement, and that his experience and practice skills in the area of patent law are highly regarded. He teaches patent litigation at the University of Akron School of Law–a law school which houses a Center for Intellectual Property Law and Technology, and offers a Certificate in Intellectual Property and a LLM.  Attorney Wilson's time in practice, extensive professional involvement in his practice area, and university teaching experience places him well-above the "median" level of skill, experience and expertise of an attorney in his field.

---

[14]    The Court notes that the attorney fees claimed by Attorney Wilson are a fraction of  KSU's legal fees, for which KSU paid a reduced, not market rate.  Further, although the record reflects that KSU may have paid KDI's legal fees, the record of KDI's legal fees is not before the Court.  Whatever that fee may be, however, it only serves to reduce the fraction of fees sought by plaintiff compared to the fees expended by defendants in the unsuccessful defense of Falana's inventorship claims.

(5:08 CV 720)

Attorney Wilson's high level of skill, experience and expertise is not just reflected by his list of credentials on paper–the reality of that skill, experience and expertise was displayed by the actual result this solo practitioner produced in this case.  Utilizing a small legal team and a fraction of the billable hours of KSU's legal team, Attorney Wilson prevailed against a major Ohio university with the resources to defeat his client in a case that defendants themselves identified as one of the most complex areas of patent law.[15]  This level of skill, expertise and experience and efficiency–and results in a case with the odds stacked against him–warrants a higher market rate than the median rate or the third quartile rate.  Attorney Wilson is at the top of his class.

The AIPLA rates provided by defendants do not contain a listing for the fourth quartile. The difference in hourly rate between the median ($250) and third quartile ($333) is $83. Attorney Wilson seeks an hourly rate of $375.  This rate is a mere $42 higher than the third

---

[15]    It is apparent from the fee agreement utilizing the median rate that Attorney Wilson was aware that plaintiff's payment of Attorney Wilson's fees was uncertain.  Attorney Wilson must have been aware that he would be outnumbered and outspent by KSU and KDI and their legal teams in an effort to defeat his client's inventorship claim.  Even with this understanding, Attorney Wilson undertook Falana's representation and persisted for years toward a successful outcome at the Federal Circuit–an outcome that involved no monetary award of damages to plaintiff.  The issue of correct inventorship is critical to the integrity of our intellectual property system and the public's interest in the correct identification of inventors. This is particularly important where the subject of the litigation goes to the core of the integrity of our intellectual property system and the resources available to the parties are widely divergent.  The correct determination of a reasonable rate is important in order to encourage competent representation.  If that were not the case an inventor, such as Falana, would find themselves without resources and competent counsel to claim their rightful status as an inventor on a U.S. Patent.

(5:08 CV 720)

quartile rate listed in the AIPLA survey.  Based on the skill, expertise and experience of Attorney Wilson, which has been aptly demonstrated, the Court concludes that an hourly rate of $375, which places Attorney Wilson's rate only slightly above the third quartile of AIPLA hourly rates, is a reasonable rate for his services.

Attorney Wilson's time log reflects that he expended 377.7 billable hours at the district court level in this case.  For the reasons discussed above, the Court has disallowed 26.97 hours as solely related to dismissed defendants.

Accordingly, for the reasons discussed above, the Court concludes in its discretion that a reasonable attorney fee for Attorney Wilson for his work at the trial court level is $375 x 350.73 hours = $131,523.75.

2.      Attorney Jon Troyer

The Court has examined the affidavit and time log of Attorney Jon Troyer.  ECF 104-4 and 104-11.  Attorney Troyer is licensed to practice law in Ohio, and has a certificate in Litigation and Intellectual Property from the University of Akron School of Law.   Attorney Troyer avers that a reasonable hourly rate for an attorney of his experience is $150 and defendants have not challenged the hourly rate of Jon Troyer.

In evaluating the AIPLA  materials before the Court submitted by the parties regarding reasonable hourly rates for patent attorneys, the Court concludes that an hourly rate of $150 is reasonable for an attorney of Jon Troyer's experience.

Attorney Troyer's time log reflects a total time expenditure of 288 hours in this case.  For the reasons discussed above, the Court has disallowed 44.5 hours as solely related to dismissed

42

(5:08 CV 720)

defendants..

Accordingly, the Court finds that a reasonable attorney fee award as to Attorney Jon Troyer is $150 x 243.5 hours = $36,525.00.

3.      Attorneys Sisson and Christeen

Plaintiff has moved for fees for Attorneys Sisson and Christeen in the sum of $25,482.16. In support of this sum, plaintiff has submitted the affidavit of Attorney Sisson (ECF 104-12) and time logs for Attorneys Sisson and Christeen (ECF 104-5).  Both Attorney Sisson and Christeen are attorneys admitted to practice before the United States Patent and Trademark Office. Attorney Sisson himself is an inventor on 16 patents.  The primary role of Attorney Sisson and his firm in this lawsuit was review of the technical documentation relative to Falana's inventorship claim.  ECF 104-12.

Attorney Sisson's intellecutal property practice is located in Northeast Ohio.  Submitted time logs reflect that Attorney Sisson's rate was charged at $320 per hour, and Attorney Christeen's rate was charged at $140 per hour, for total billable time of $25,482.16.[16]

Defendants have not objected to plaintiff's fee application with respect to the Sisson firm, either as to the hourly rates for Attorney Sisson and Christeen or as to the hours billed.  The Court has reviewed the time logs and hourly rate AIPLA survey material provided by defendants and concludes that the time entries reasonable for services performed and the hourly rates reasonable in light of the qualifications of Attorneys Sisson and Christeen.

---

[16] $7,346.24 is reflected on the time log as not billed.  ECF 104-5.

43

(5:08 CV 720)

Accordingly, the Court will allow plaintiff's fee application for Attorneys Sisson and Christeon in the sum of $25,482.16.

4.      Attorney Darmon

Plaintiff has moved for fees for Attorney Darmon in the sum of $1,275.  In support of the fee for Attorney Darmon, plaintiff submits a statement purported to be a statement for legal fees incurred by plaintiff for services related to plaintiff's inventorship claim in Ocotber 2006.  ECF 104-6.  Exhibit B to plaintiff's complaint reflects that Mr. Dorman was representing plaintiff in Spring 2006 in connection with plaintiff claim to be named as an inventor on the '789 Patent. ECF 1-2.

While it appears to the Court that Mr. Dorman represented plaintiff with respect to his inventorship claim, there is no documentation before the Court by which the Court may determine whether the fee claimed by plaintiff for Attorney Dorman is reasonable.  Accordingly, the fee claimed by plaintiff for Attorney Dorman is disallowed.

### SUPPLEMENTAL MOTION FOR ATTORNEY FEES

After prevailing before the Federal Circuit on defendants' appeal on the inventorship issue, plaintiff filed a supplemental application for attorney fees and costs for fees and costs incurred during the appeal of this case. ECF 122.  Section 285 does not bar a district court from awarding fees for the entire case, including subsequent appeals.  *Therasense, Inc. v. Becton, Disckinson and Co.,* 745 F.3d 513, 517 (C.A. Fed. 2014) (citing *Comm'r, INS v. Jean*, 496 U.S. 154, 160 (1990) and *Rohm & Haas Co. v. Crystal Chemical Co.*, 736 F.2d 688, 692 (C.A. Fed. 1984)).  The same analysis under § 285 is required for the Court to evaluate plaintiff's motion for

44

(5:08 CV 720)

fees related to defendants' appeal as was required for the § 285 determination regarding trial court proceedings, above.

When the Court issued its final order ruling that Falana was an inventor on the '789 Patent, the Court specifically declined to issue a final order on attorney fees pending the defendants' appeal of the inventorship ruling.  ECF 92. Defendants appealed to the Federal Circuit the Court's final ruling on inventorship, as well as the Court's non-final order that the case was exceptional within the meaning of § 285. Specifically, defendants raised the following issues on appeal before the Federal Circuit: 1) claim construction; 2) exclusion of evidence; 3) joint inventorship determination; and 4) exceptional case determination. The Federal Circuit refused to address "the district court's exceptional case determination and attorney fees award, which are not properly before us." *Falana v. Kent State Universtiy*, 669 F.3d at 1352.

It was clear from the Court's order filed at ECF 92 that the Court's exceptional case determination was not a final order.  It was also made clear by the Federal Circuit that defendant's appeal of the Court's exceptional case determination was not properly before the Federal Circuit.  Defendants counsel are experienced attorneys, and the law by which the Federal Circuit declined to address the exceptional case aspect of defendants appeal is clear and well-established. *Falana v. Kent State Universtiy*, 669 F.3d at 1359-62.  Defendants appeal of a non-final order wasted judicial resources of the Federal Circuit and legal resources by requiring plaintiff's counsel to respond to an aspect of defendants' appeal that was not properly before the Federal Circuit.  Attorney Wilson successfully argued before the Federal Circuit that the Court's non-final exceptional case determination was not properly before the panel, and is the prevailing

45

(5:08 CV 720)

party.

It is unusual for experienced lawyers, such as defendants' counsel, to attempt to appeal a non-final order where the non-final nature of the order is specific and clear and the law is well-established that the matter cannot be properly appealed.  If appeals of non-appealable orders took place in the ordinary course, both judicial and legal resources would be regularly wasted as a consequence of presenting an issue on appeal over which the Federal Circuit did not have jurisdiction.  Such conduct on the part of counsel unnecessarily increases already expensive intellectual property litigation.

For these reasons, the Court concludes in its discretion that defendants' appeal before the Federal Circuit is exceptional within the meaning of § 285 with respect to the portion of the appeal relating to the Court's non-final exceptional case determination.  The Federal Circuit addressed a total of four topics on appeal by defendants as listed above, including defendants' improper attempt to appeal a non-final order.  Accordingly, the Court concludes that 25% of defendants appeal constitutes an exceptional case and that it is appropriate to award attorney fees to plaintiffs with respect to that portion of the appeal pursuant to § 285.

In support of his supplemental motion for attorney fees, plaintiff submits the time logs for Attorneys Wilson and Troyer.  According to the time log, Attorney Wilson expended a total of 55 hours in connection with defendants' appeal to the Federal Circuit at an hourly rate of $375. ECF 122-1.  Attorney Troyer's time log reflects that he expended a total of 171 hours post-appeal at an hourly rate of $150.

46

(5:08 CV 720)

Attorney Wilson and Attorney Troyer's time logs are directed to the appeal as a whole and are not divide among the four topics addressed on appeal by the Federal Circuit.  Because the Court has concluded that 25% of defendants' appeal constitutes an exceptional case, the Court will allow 25 % of the attorney fees related to the appeal and disallow 75%.

With respect to Attorney Wilson, the Court has already concluded, *supra*, that an hourly rate of $375 an hour is a reasonable rate for an attorney of Attorney Wilson's skill, experience and expertise, and for those same reasons, that rate is appropriate to use in connection with plaintiff's supplemental motion for attorney fees.   Accordingly, plaintiff is awarded reasonable attorney fees for Attorney Wilson for the portion of defendants' appeal related to non-appealable exceptional case determination as follows: 13.75 hours x $375 = $5,156.25.

With respect to Attorney Troyer, the Court has already concluded and defendants do not object than an hourly rate of $150 is a reasonable fee for an attorney of Jon Troyer's experience. Attorney Troyer's time log reflects 171 hours expended on defendants' appeal and post-appeal proceedings before the undersigned.  Of those 171 hours, 127.5 hours were expended on the appeal.  A total of 43.5 hours were expended post-appeal in further proceedings before this Court, of which defendants object to the 31.5 hours on the grounds that those hours were expended in connection with mediation requested by the Court.

Accordingly, plaintiff is awarded reasonable attorney fees for Attorney Troyer with respect to defendants' appeal of the non-final exceptional case determination as follows: 31.88 hours x $150 = $4,781.25.  With respect to the further proceedings before this Court, all of Attorney Troyer's fees will be allowed as reasonable attorney fees under § 285 with the

47

(5:08 CV 720)

exception of those hours related to mediation, to which the defendants have objected on the

grounds of public policy.  Accordingly, plaintiff is further awarded reasonable attorney fees for

Attorney Troyer as follows: 12 hours x $150 = $1,800.

Plaintiff's motion for costs associate with the appeal is granted for 25% of the costs and

disallowed for 75%.

### CONCLUSION

For the reasons contained herein, the Court finds this case to be exceptional and an award

of attorney fees to be appropriate pursuant to 35 U.S.C. § 285.  Accordingly, plaintiff's motion

for attorney fees and costs (ECF 104) is GRANTED as follows:

Attorney Wilson: $131,523.75

Attorney Troyer: $36,525.00

Attorneys Sisson and Christeen: $25,482.16.

Plaintiff's motion for costs is granted in the sum of $1,912.80.

Further for the reasons contained herein, plaintiff's supplemental motion for attorney fees

and costs related to defendants' appeal (ECF 122) is GRANTED as follows:

Attorney Wilson: $5,156.25

Attorney Troyer: $6,581.25

Plaintiff's supplemental motion for costs related to defendants' appeal is allowed for 25% of the

total amount of the costs.   IT IS SO ORDERED.

July 31, 2014                                             s/David D. Dowd, Jr.
Date                                                          David D. Dowd, Jr.
                                                                U.S. District Judge

48